**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTH CAROLINA**
**FOR THE WESTERN DISTRICT**

RAYMOND GEE and
GVEST CAPITAL, LLC,

                                           **CIVIL ACTION Case No.**
                        Plaintiffs,

v.

TYSON RHAME,

                        Defendant.

## COMPLAINT FOR DECLARATORY RELIEF and DAMAGES

Plaintiffs Raymond Gee ("Gee") and Gvest Capital, LLC ("Gvest") (collectively "Plaintiffs"), by and through their undersigned counsel, hereby sues Defendant Tyson Rhame ("Rhame") and alleges:

## I.    NATURE OF THE ACTION

1.    This is an action for declaratory relief pursuant to 28 U.S.C. §2201(a) to determine that a Side Letter agreement ("Side Letter") procured through the Defendant's wrongful conduct is invalid and unenforceable and to recover damages resulting from Defendant's wrongdoing.

## II.    PARTIES AND JURISDICTION

2.    Gee is a citizen and resident of Florida.

3.    Gvest is a North Carolina limited liability company owned and managed by Gee, with its principal place of business in Pineville, Mecklenburg County, North Carolina.

1

4.      Rhame is a citizen and resident of Georgia.

5.      At all times pertinent, Rhame has been engaged in substantial activity within the State of North Carolina, through his individual activity or activity undertaken through entities which he owns and controls, including:

a.    On December 19, 2014, Rhame and Gee each purchased a one-half interest in the 20-story office building and land located at 200 West Second Avenue, Winston-Salem, NC, which was then the corporate headquarters for BB&T Bank and known as and referred to herein as the BB&T Financial Center.

b.    On or about March 20, 2014, Rhame purchased a 699-acre development on Lake Norman in Catawba County, NC for $5.8 million, which he continues to own through Sherrills Ford Holdings, LLC, a North Carolina limited liability company, which he exclusively owns and controls.

c.    On or about March 5, 2012, Rhame acquired and continues to own a 37.5% interest in Yards at Noda, LLC, ("Yards") a North Carolina limited liability company that owns a 182-unit apartment complex in the NoDa section of Charlotte, NC with plans to build a second phase consisting of 160 additional units. Since August 2014, Rhame has been a co-manager of Yards.

d.    Rhame has previously utilized the benefits and privileges of North Carolina law and legal protections by filing suit in Federal District Court for the Middle District of North Carolina against the Plaintiffs for alleged claims in connection with the BB&T Financial Center as described in more detail below.

e.    Upon information and belief, Rhame is slated for a period of residency in Butner,

2

North Carolina to serve his 15-year prison sentence in connection with his conviction on fraud related criminal charges pertinent to this action and referenced herein.

f. By letter dated August 5, 2024, (see ¶ 9 below) Rhame, through counsel, undertook to usurp Gee's ownership of a 25% interest in Yards valued in excess of $10 million in return for transfer of Rhame's ownership interest in the BB&T Financial Center as described herein, which Plaintiffs believe has no value as a result of Rhame's fraud, deception and criminal conduct described herein.

6. This Court has jurisdiction pursuant to 28 U.S.C. §1332 because the amount in controversy exceeds $75,000, exclusive of interests and costs, and the Plaintiffs and Defendant are residents of different states.

7. Based upon the foregoing, this Court has personal jurisdiction over Rhame based upon his systematic and greater than minimal contacts with the State of North Carolina, including but not limited to his substantial activity in the forum, his ownership (through solely owned and controlled business entities) of property in the forum, and his invoking and benefiting from the forum's laws.

8. Venue in this district is proper pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the acts giving rise to this action occurred within this judicial district or a substantial part of property that is the subject of the action is situated in this judicial district.

## III.   REASON FOR THIS ACTION

9. By letter dated August 5, 2024, which referenced and contained a December 18, 2014 "Side Letter" (see **Exhibit 1 and accompanying "Side Letter" (Exhibit A)** attached

3

hereto), counsel for Defendant Rhame demanded that Plaintiffs convey Gee's 25% ownership interest in Yards to Rhame. The Side Letter is invalid for the reasons set forth herein and Plaintiffs seek Declaratory Judgment voiding and setting aside the Side Letter and enjoining Defendant from attempting to enforce it along with indemnity damages resulting the Defendant's criminal activities.

IV.     **CIVIL FORFEITURE ACTION AND CRIMINAL INDICTMENT AGAINST RHAME**

10.     On or about June 5, 2015, the United States filed a Civil Forfeiture Action against Rhame and his associated assets and entities (including the BB&T Financial Center) in the Northern District of Georgia in connection with Rhame's ownership and operation of a business known as Sterling Currency Group, LLC ("Sterling") with James S. Shaw that ran a fraudulent investment scheme involving the Iraqi dinar. (see Amended Verified Complaint for Forfeiture attached as **Exhibit 2**.)

11.     The Civil Forfeiture Action initially included Gvest because of its association with Rhame, including management of the BB&T Financial Center. After incurring legal fees in excess of $186,000 to defend against the civil forfeiture and comply with requests for information from the offices of the prosecuting U.S. Attorney, all claims against Gvest were voluntarily withdrawn by the government in February 2016 upon determination that Gvest had no involvement with Sterling or the Iraqi dinar scheme.

12.     On or about February 10, 2016, a Criminal Indictment was filed against Rhame in connection with the Iraqi dinar scheme (see Criminal Indictment attached as **Exhibit 3**). On October 9, 2018, Rhame was convicted on multiple counts of mail and wire fraud along with

4

making false statements to the FBI and was sentenced to 15 years in prison (see Judgment in a Criminal Case attached as **Exhibit 4**).

## V.   PRIOR BB&T LITIGATION AND TOLLING AGREEMENT

13.   In March 2016, Rhame filed suit against Gee and Gvest in Federal District Court for the Middle District of North Carolina in a suit captioned *Tyson Rhame v. Raymond Gee and Gvest Capital, LLC* (1:16-cv-00230) (the "BB&T Case").

14.   The BB&T Case stemmed from the Civil Forfeiture Action, resulting in claims, affirmative defenses and counter claims. (see the BB&T Complaint and Amended Answer and Counterclaim, *sans exhibits* attached as **Exhibits 5 and 6**, respectively).

15.   Following some brief discovery, the BB&T Case was stayed by the Court on November 16, 2017 (see **Exhibit 7** attached hereto), because of discovery issues emanating from the federal criminal charges pending at the time against Rhame from the Iraqi dinar scheme.

16.   The stay of the BB&T Case was still in place as of March 8, 2022, when the parties filed a Joint Stipulation of Dismissal of all claims and counterclaims (see **Exhibit 8** attached hereto).

17.   On February 15, 2023, the parties entered into a Tolling and Standstill Agreement with two subsequent extensions that extended the time through September 29, 2024, to pursue all claims that could have been refiled within one year of the Stipulation of Dismissal (see **Exhibit 9** attached hereto).

## VI.   BACKGROUND

18.   Gee has worked in the field of real estate finance, property and asset management

5

and development for many years and first met Rhame around 2010 through a mutual business acquaintance, James S. Shaw.

19.    Rhame and Gee had little business contact until the Spring and Summer of 2014, when Rhame advised Gee that he (Rhame) was doing well financially and requested that Gee let him know of good property investment or development projects that needed capital investment that would allow Rhame to diversify his assets.

20.    Between April and December of 2014, Rhame visited Gee on several occasions in Charlotte, North Carolina. During meetings, dinners, and telephone calls at that time with Gee, Rhame consistently emphasized that he had significant wealth, was very liquid and desired to invest with Gee in real estate transactions and also wanted Gee to share real estate investment opportunities.

A.    **The BB&T Project**

21.    Gee discussed several investments opportunities with Rhame, including the BB&T Financial Center, which was of significant interest to Rhame.

22.    After investigating the BB&T Financial Center with his business advisors, Rhame decided to purchase the property with Gee, under a plan whereby equity capital would be provided by Rhame and property management, including leasing matters, and recoupment of capital investment through the sale of IRS section 1031 exchange interests would be provided by Gee (the "BB&T Project") as described below.

23.    At the signing of the lender term sheet and the purchase and sale agreement with the seller, Rhame wired funds to the lender for due diligence and wired deposit funds to the title

6

company, confirming that Rhame was prepared to do the BB&T Project on the terms as had been agreed with Gee and as articulated in the operating agreements.

24. The primary terms for the BB&T Project called for Rhame to jointly purchase the project with Gee as equal owners through use of limited liability companies and statutory trust entities designed to return the initial capital investment as summarized herein. As the capital investor, Rhame would invest approximately $7.4 million equity in the purchase, with the remaining portion of the $43.5 million purchase price to be lender financed.

25. The BBT Project terms also called for the plaintiffs to be responsible for the property leasing and management and to do the administrative and organizational tasks necessary to create a structural framework of ownership and management entities to accomplish the Parties' investment objectives. Gee's responsibilities included arranging the purchase financing, setting up the ownership and management entities along with providing the management and structuring expertise to complete the transaction to recover the initial capital investment by selling beneficial interests in 200 West Beneficial Holdings DST to retail purchasers seeking like kind exchange properties under section 1031 of the IRS code.

26. In order to structure the BB&T Project for the Parties' intended transaction and benefits, Gee obtained the services of counsel and other professionals necessary to properly complete the transaction documents, including the establishment of several acquisition, management and holding Delaware Limited Liability Companies ("DLLC") and Delaware Statutory Trusts ("DST") entities as shown on the BB&T Organizational Plan (see **Exhibit 10** attached hereto).

7

27.     It was essential to both Rhame and Gee that the BB&T Project be able to effectively market and sell the 1031 tax exchange  beneficial interests in the Delaware statutory trust entity to third party investors with the proceeds used to pay debt and make distributions to Rhame and Gee as the members of 200 West Capital, LLC ("Land LLC") in accordance with the Limited Liability Company Operating Agreement of the Land LLC.

28.     Both Rhame and Gee had determined that that there was significant demand for properties that would qualify for section 1031 tax exchange benefits and that the BB&T Project could be structured to qualify for 1031 tax exchange treatment.

29.     Rhame and Gee agreed that their rights and interests in the purchase, management ongoing ownership of the BB&T transaction would be reflected by the terms of the Operating Agreements and Trust Agreements of the DLLCs and DSTs making up the BB&T Project. To that end, Gee incurred significant expense in connection with the due diligence work associated with the purchase, including the establishment of the company and trust entities, along with the retention of legal and financial professionals and others necessary to complete the complex transaction. The closing of the transaction took place on December 19, 2014, in New York City.

**B.     The Side Letter**

30.     On December 18, 2014, the day before closing, Gee was contacted by Mr. Doug Shumate ("Shumate"), who advised that he was a representative of Rhame. Although Rhame and Gee had already agreed on the terms of their purchase, ownership and management of the BB&T Project, including the closing for the transaction on December 19, 2014, Shumate advised Gee that Rhame would not go through with the agreed transaction unless Gee gave Rhame additional consideration and protection by executing the Side Letter.

8

31.     The condition communicated by Shumate was the first time that anything had been mentioned to Gee about executing a side agreement containing any variation of the rights and obligations of Rhame and Gee other than what they had already agreed would be reflected in the organizational and operational documents of the individual DLLCs and DSTs, that comprised the BB&T Project.

32.     At the time, Rhame knew that Gee and Gvest employees had devoted countless hours of labor doing the necessary work to close on the BB&T Project and additionally, knew that Gee and Gvest had incurred many thousands of dollars in expenses in preparing to close.

33.     Rhame was also aware that Gvest would not be compensated for the many months of work done by its employees if closing did not occur and he knew that cancelling the transaction on the eve of closing would significantly harm Gee's reputation within the structured real estate finance business community, especially after substantial labor and expense had been expended by the parties, finance companies, legal and insurance professionals to conclude the transaction.

34.     Upon information and belief, Rhame knew that failure to close and loss of reimbursement and compensation for the incurred expenses, along with the damage to Gee's reputation in the structured real estate financing community would be economically devastating, resulting in substantial and irreparable harm and damage to both Gee and Gvest.

35.     With such knowledge, Rhame deliberately waited until the day before the scheduled closing to present his demands for "extra protection" as relayed by Shumate, knowing that Gee would not be able to find a substitute investor or source for the required capital investment prior to the scheduled closing.

9

36.     Rhame purposely timed his demand for "extra protection" to exert undue, unfair pressure and extreme duress upon Gee, designed to force Gee to acquiesce to the new, additional, unfair terms, lacking of consideration, in an effort to overcome Gee's will and compel Gee to accept new terms that had not been agreed upon and which were intended by Rhame to facilitate his acquisition of other property interests owned by Gee that were unrelated to the BB&T Project.

37.     Gee lacked the financial resources and liquidity of Rhame and due to the timing of Rhame's demand and the financial commitments and obligations that Gee had incurred in connection with the closing of the BB&T Project, which directly impacted other financial obligations and transactions, he determined that he had no choice but to acquiesce to the additional terms that Rhame demanded in the Side Letter.

38.     Shumate communicated directly with the attorney that had been hired to prepare the closing documents and instructed the additional terms to him and had him draft those terms in the Side Letter which Shumate requested to be drafted as if it was a purported letter from Gee. In fact, Gee did not draft the Side Letter as it was originally planned and put into effect by Shumate at Rhame's behest and was signed by both Rhame and Gee in New York City the day prior to closing on the BB&T Project.

**C.     Rhame's Tainted Funds**

39.     Upon information and belief, at least since 2004, Rhame has been a 50% owner of Sterling which owned and operated several other businesses engaged in exchanging and selling exotic currencies, most predominantly Iraqi dinar. From 2004 through 2015. Sterling grossed revenues over $600 million, and Rhame and its other owner, James Shaw ("J. Shaw") received distributions in excess of $180 million.

10

40. Upon information and belief, Rhame participated in efforts to increase consumer demand for the Iraqi dinar by facilitating and spreading false information that the upward re-evaluation of the dinar was imminent through such means as radio show appearances, written articles and payments of over $160,000 to the host of a radio program to fuel such rumors, when Rhame knew that the rumors were not true.

41. At least as early as November, 2010, Rhame was aware that his partner in Sterling believed that they were operating an illegal "Ponzi scheme" and at risk for "lawsuits" and "serious jail time" and "prison" as shown by the emails concerning Sterling Currency and the dinar scheme exchanged between Rhame and his partner, James Shaw, referenced in paragraphs 18-20 of the Civil Forfeiture Complaint.

42. At all times pertinent to the work, planning, investment and closing on the BB&T Project, Rhame knew or should have known that he had received distributions from Sterling totaling in excess of a hundred million dollars resulting from the fraudulent marketing and sale of Iraqi dinar as described in the Civil Forfeiture Action and Criminal Indictment.

43. Upon information and belief, the funds paid by Rhame into the purchase of the BB&T Project originated from the following entities and accounts controlled by Rhame as described on Exhibit J to the Civil Forfeiture Complaint:

    a. $1,000,000 came from Lullwater, LLC;

    b. $4,050,000 came from Trinvest, LLC.

44. Upon information and belief, Rhame knew or should have known that the funds he paid in deposit and closing towards the purchase of the BB&T Project were derived illegally

through wire fraud, mail fraud or money laundering by Rhame and others associated with Sterling.

45.     Even if  it is determined that the funds paid by Rhame towards the purchase of the BB&T Project were not derived illegally, Rhame had reason to believe as early as November 2010 that the funds he received from Sterling and that he paid into the BB&T Project were sufficiently defective and tainted with illegality that his payment subjected BB&T to forfeiture and seizure as evidenced by the email set forth in paragraph 41 above and the allegations and additional emails referenced in the attached Civil Forfeiture Complaint and Criminal Indictment.

### D.     Rhame's Concealment

46.     Rhame was obligated to share such information regarding defects and illegalities associated his capital investment with Gee and the lending institutions prior to closing the BB&T transaction, which would have allowed Gee the opportunity to withdraw from the transaction and avoid the damages described herein.

47.     Despite such knowledge, Rhame deliberately concealed from Gee any legal defects or impairments associated with the funds that Rhame planned to invest into the BB&T Project in order to induce Gee to go through with the transaction, including execution of the Side Letter, all in an effort to launder the tainted funds and acquire other, unrelated property interests from Gee, by illegal, concealed, deceptive and unfair means.

48.     Rhame knew that such disclosure, especially if made in a timely manner, would result in Gee terminating Rhame's participation in the BB&T Project and purchase and would allow Gee to locate and close the transaction with another capital investor. Moreover, Rhame made the specific representations (described in paragraphs 57 and 58 below) to deceive Gee into

12

believing that Rhame's source of funds was beyond reproach, which Gee reasonably believed based upon Rhame's statements and conduct.

49.     Additionally,  Rhame knew or should have known that  the funds he invested in the BB&T Project were tainted with illegality which would subject the Project to forfeiture, seizure or judgment lien and prevent the marketing and sale of the IRS section 1031 DST interests due to asset instability resulting from the potential loan default, foreclosure or forced sale, potential guarantor and DST trustee conviction, all resulting from the tainted funds and contributing to uncertainty regarding 1031 tax benefits.

50.      Rhame knew or should have known of the illegal nature of the funds he was investing in the BB&T Project as early as November 2010. Gee was completely unaware and had no way of knowing that the equity funding provided by Rhame for the BB&T Project was tainted with illegality and would subject the transaction to forfeiture, seizure, *lis pendens* or judgment lien. Gee did not learn of Rhame's illegal activities until Gvest Capital was served with process in the civil forfeiture action in June 2015.

51.     In connection with the BB&T Project and the Side Letter, Rhame knew or should have known that he was obligated to communicate and deal openly, fairly and honestly with Gee, and was specifically obligated to disclose any potential illegal activities or potential legal problems associated with the funds he intended to invest in the project.

52.     Rhame knew that Gee had no way of ascertaining any illegality or legal defect associated with the capital funding Rhame provided to the BB&T Project. Based upon previous multimillion dollar joint investor transactions that Gee and Rhame had done together, including

Yards, Cascades at Rea, Sherrills Ford and Arrowood, Gee reasonably relied upon, and trusted Rhame to be open and honest and to divulge any problems or defects relating to the funds invested by Rhame in the BB&T Project.

53. Rhame knew or should have known that the legal status of the funds was basic to the transaction and material to Gee, and that Gee would not have entered into the transaction had Rhame fully disclosed problems or potential illegalities associated with his funds or Sterling.

54. Rhame intentionally concealed information relating to the "dinar revaluation" fraud and layaway-Ponzi scheme used by Sterling to generate business along with the efforts by Rhame to launder the tainted funds he received from Sterling in order to induce and deceive Gee to enter into the BB&T Project transaction.

55. Rhame sought to benefit from the transaction by using Gee's expertise and efforts to surreptitiously "launder", invest and diversify Rhame's capital investment into legitimate funds upon repayment by way of the sale of the section 1031 DST interests or by seeking to obtain ownership of unrelated property of Gee's through the Side Letter.

56. Rhame invested funds in the BB&T Project despite his knowledge of the legal risks that the funds imposed upon the project and while concealing those risks from Gee. As a result, the BB&T Project was brought into the Civil Forfeiture and a *lis pendens* was filed on the property, making it impossible for the Project to go forward with the sale of the IRS section 1031 interests as had been originally planned.

### E. Rhame's Misrepresentations

57. Rhame advised Gee that his primary source of income was from Sterling as early

14

as 2011. Beginning in March 2014, Rhame expressed a desire to diversify his holdings, which he characterized as "too liquid", and made multiple representations regarding the legality of his funds, which Gee reasonably believed, including:

a. That the funds he earned and invested from Sterling had met and passed extensive, regularly conducted banking and Government auditing and compliance requirements. Specific instances that Gee recalls include;

b. Following the Sherrills Ford closing on March 20, 2014, while dining at Houston's restaurant in Atlanta, Rhame described the strict regulatory auditing and compliance procedures required for Sterling, mentioning that it spent millions of dollars on compliance, that it had a full-time compliance officer and stating that they [Sterling] were the good guys in the industry seeking to "root the bad guys out".

c. On April 9, 2014, Gee and an associate at Gvest, Adam Martin ("Martin"), drove to Rhame's home in Atlanta. That evening, Rhame advised Gee and Martin that he was highly liquid and needed to diversify into the types of commercial projects managed by Gee. Rhame also discussed Sterling, stating that it was a high-volume currency exchange business that was highly regulated, having to comply with extensive, ongoing governmental regulatory compliance audits. Rhame also extolled Sterling's exemplary record of regulatory audit compliance and stated that Sterling was assisting the government to locate and remove bad companies from the industry.

d. In late April or May of 2014, Rhame went on at length about Sterling's exemplary Governmental regulatory audit compliance record during an automobile ride with Gee from the Charlotte Marriot to Gee's office in Pineville. The conversation continued later that day when Gee drove Rhame to the Monroe airport, from where he flew his plane back to Atlanta.

15

e. On December 7, 2014, Rhame flew to Charlotte with a potential investor named Abul. While having dinner at the Fahrenheit restaurant that evening, after taking a helicopter ride over projects that Rhame and Gee were in the process of acquiring, Rhame began an unsolicited discourse on the integrity and ethics of Sterling's business practices, emphasizing that it was a high-volume business that was subject to ongoing, multiple levels of regulatory compliance auditing. He stated that Sterling spent several million dollars per year on compliance and that it was working with the Federal Bureau of Investigation ("FBI") to eliminate fraudulent companies.

f. The following day, Rhame invited Gee to fly on Rhame's jet with his CFO, Frank Bell, to Aiken, SC to spend time at Rhame's Sage Valley Country Club. While there, ostensibly to show his law-abiding nature, Rhame introduced Gee to two "friends" who were FBI special agents. Later on that trip, Rhame again launched into the subject of the stringent banking and government financial compliance requirements which made it difficult for businesses like Sterling to obtain and maintain necessary banking relationships, and emphasized that much of Sterling's success was attributable to its exemplary audit and compliance record and its ability to maintain necessary banking.

58. Rhame specifically represented to Gee and to the lender for the BB&T Project closing that the funds he was investing in the project had been obtained legally and that said funds were not the product of money laundering other illegal activity, or subject to forfeiture including:

a. In early November 2014, Gee advised Rhame by telephone that the lender on the BB&T Project would require that Rhame sign a guaranty containing "bad boy carveouts" prohibiting the investment of illegally obtained funds, to which Rhame replied "no problem".

b.  At the BB&T closing, Rhame represented that he was investing legally obtained funds, agreeing to §4.23 of the Nataxis Primary Loan Agreement as confirmed by and incorporated in the Guaranty of Recourse Obligations ("Guaranty") signed by Rhame at closing, both documents being incorporated herein by reference. Section 4.23 of the Nataxis Loan Document reads in pertinent part:

> 4.23 Anti-Money Laundering. None of the funds of Borrower, Borrower Representative, Mezzanine DST, Master DST or any Guarantor, as applicable, that are used to consummate this transaction are derived from or are the proceeds of any unlawful activity, with the result that the investment in Borrower, Borrower Representative, Mezzanine DST, Master DST or any Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law or may cause any of the Property to be subject to forfeiture or seizure.

c.  Rhame had also made a similar verbal representation that he was not engaging in any illegal activities during a telephone call with Gee in August 2014 when Gee advised that the lender on the Arrowood Stations project involving Rhame and Gee would require "bad boy carveouts".

d.  Rhame followed up that call by signing loan documents on September 12, 2014 on the Arrowood Stations project stating he was not involved in illegal activities.

59.  It was basic to the transaction that all funds invested have been earned and obtained legally so as not to subject the BB&T Project to seizure, forfeiture or liens or default under the loan documents. Rhame knew or should have known that any potential illegality associated with the funds that he invested in the BB&T Project could result in forfeiture, seizure or judgment lien that would damage Gee and the contemplated 1031 transactions, and Rhame was obligated to

17

advise Gee of any potential defects or problems affecting the legal status of the funds he was investing.

60.     Had Gee known that Rhame was engaged in the wire and mail fraud and money laundering activities as described in the civil forfeiture and criminal indictment, or had he known that the funds that Rhame provided were  associated with potentially illegal activity, Gee would never have engaged in any purchase or investment transaction with Rhame, and would have rejected any attempt by Rhame to invest in and become part purchaser of the BB&T Project, and certainly would have refused to sign the Side Letter, which ostensibly jeopardized other property interests owned by Gee.

61.     Based upon Rhame's representations of honestly and legally earned wealth, along with his concealment of illegal activities at Sterling, including mail and wire fraud and money laundering of funds received from Sterling, Gee reasonably believed that the funds Rhame invested in the BB&T Project were not tainted with legal problems or uncertainties.

62.     In fact, Rhame breached his duties of good faith and fair dealing in that his representations were false as described in the Civil Forfeiture Action and Criminal Indictment and as determined by the jury that found Rhame guilty on multiple counts of mail fraud and wire fraud in October 2018 in connection with the dinar scheme.

63.     By the time that Gee learned of Rhame's illegal activities in June 2015, Gee had invested substantial money, time and labor into the acquisition and management of the BB&T Project and in preparing the DST interests for marketing and sale to investors in connection with Section 1031 IRS deferred tax exchange transactions and could not rescind the transaction.

18

**F.**    **Consequences of Rhame's Wrongdoing**

64.    Following the closing on the BB&T Project on December 19, 2014, Gee followed through on his obligations to manage the property and to set up and do the preparatory work for the marketing and sale of the section 1031 DST interests. To that end, Gee and Gvest handled the day-to-day tasks associated with the property management of the BB&T Financial Center pursuant to the Management Agreement executed at closing with no complaints or issues from Rhame, BB&T, or the transaction lenders.

65.    Both Rhame and Gee were aware that the successful marketing and sale of DST beneficial interests to IRS section 1031 purchasers was a fundamental objective of the BB&T Project requiring that they avoid any activity that might impair or diminish the value or stability of the Project or property.

66.    Following closing on the BB&T Financial Center, Gee and Gvest began the necessary undertakings to accomplish the marketing and sale of the DST beneficial interests to IRS section 1031 purchasers, including, among other things, hiring a professional with Securities experience to market and sale the DST interests, taking on additional staff to prepare the requisite documentation and conduct the marketing and sales of the DST beneficial interests. Additionally, significant research was completed and compiled into an Offering Memorandum and legal advice and services were retained to confirm compliance with all legal and regulatory requirements.

67.    Although it had been estimated that it would take from 12 to 18 months to sell the DST interests, less than six months after closing, the plan to market and sell the 1031 DST interests came to an abrupt termination when the Federal Civil Forfeiture action was filed against Rhame

19

and the designated property owner entity, 200 West Land DST, and the designated property manager, Gvest.

68.     As a result of the civil forfeiture and criminal indictment, it became impossible to market and sell the 1031 DST interests. The professional that had been hired to market and sale the DST interests advised that the required disclosure of the civil forfeiture proceeding, the *lis pendens* (see **Exhibit 11** attached hereto) that had been filed against the property and the claim and criminal action against the guarantor of the primary mortgage loan (Rhame) would make it impossible to sell the DST interests.

69.     Additionally, the impairment of the required asset and loan security for potential 1031 purchasers and the resulting jeopardy to 1031 tax benefits resulting from the civil and (later) criminal forfeiture proceedings, along with the criminal indictment, and the *lis pendens* recorded on the property created an unstable situation that was untenable for purchasers seeking like kind 1031 deferred capital gains tax benefits. Such purchasers fundamentally required property stability in order to avoid jeopardizing the expected tax benefits, therefore making it impossible to sale the 1031 DST Interests.

70.     Any effort to sell DST interests required full disclosure of the Federal litigation, causing potential buyers of such interests to have no interest in purchasing due to potentially adverse tax consequences resulting from the legal proceedings and the potential for loan default or foreclosure and loss of the 1031 tax benefits.

71.     The negative effect of the Civil Forfeiture, the *lis pendens* and the federal criminal charges and conviction of Rhame, upon information and belief, also resulted in BB&T Bank (now

Truist) failing to renew its lease of the BB&T Financial Center, which expired March 31, 2023.

72.     The plan to market and sale interests in the DST interests was crucial to the transaction and the primary basis for structuring the 200 West entities as set forth on the Organization Chart attached hereto.

73.     The parties contracted with the understanding that the unfettered ability to market and sell the DST interests was absolutely necessary in connection with the transactional plan to return capital investment referenced in the DST and DLLC trust and operational documents and in the Side Letter.

74.     Rhame was obligated to advise Gee of the uncertain legal status and defects associated with the deposit and closing funds that he paid towards the BB&T purchase because he knew that it was material to the transaction, that it was material to Gee and the lenders and that any uncertainty or defect associated with the legal status of the funds would critically impair the planned sale of IRS code section 1031 DST  interests,  in addition to damaging Gee by way of the Side Letter and subjecting the lender financing to declaration of default.

## FIRST CLAIM:  Fraud

75.     Plaintiffs incorporate all preceding paragraphs and allegations as if fully set forth.

76.     Rhame verbally represented to Gee on multiple occasions by telephone and in person that he was doing well financially from his business at Sterling, was very wealthy and was a multimillionaire, while withholding all information regarding potential illegal activities associated with such funds and investments. Rhame made frequent references to his wealth, making it difficult to remember specific dates and statements. But Gee does recall the following:

21

a. A mid-November 2011 restaurant meeting at Cabo Fish Taco in Charlotte, with Rhame and his partner at Sterling, James Shaw, along with the broker and then property owners of the Noda Yards property, where Mr. Rhame stated that his business at Sterling had earned $300 million gross and $100 million net that year.

b. In early December 2014, prior to the BB&T closing, Gee was provided a financial statement from Rhame showing his individual net worth in excess of 137 million dollars.

c. Rhame advised on a number of occasions that he owned a private jet and shortly before the BB&T Project closing in December 2014, Rhame told Gee that he had just purchased a one-half interest in a 100-foot yacht.

77. Upon information and belief, the bulk of Rhame's wealth had been acquired illegally as described in the Civil Forfeiture Complaint and Criminal Indictment attached hereto. Rhame never disclosed to Gee that he had engaged in any of the described illegal activities, which included conspiring to circulate false information regarding the potential reevaluation of the Iraqi dinar, running a Ponzi scheme disguised as the Sterling "layaway program" (where purchasers could pay as little as 5% or 10% down for a 30 day option to purchase upwardly "revalued" dinars at the original exchange rate) and investing illegally obtained funds in other businesses and accounts in an effort to "launder" or remove associated illegality.

78. Rhame lured Gee into allowing Rhame to invest with him by his entreaties of wealth, of being too liquid, of his need to diversify and of the stringent regulatory compliance required for his Sterling business, as described in paragraph 57 above. Gee reasonably believed and relied upon Rhame's representations and concealments which deceived him into entering into

22

the BB&T transaction with Rhame under the false, but reasonable belief that Rhame had earned his money legally and that it would not legally jeopardize the BB&T Project.

79.     Rhame had a duty to disclose the legal defects, problems and potential jeopardy associated with the funds he invested in the BB&T Project in that:

a.     Rhame knew or should have known that his financial condition was based in large part upon illegal activities as described in the Civil Forfeiture and Criminal Indictment, and that it was fundamentally basic to the success of the BB&T Project transaction that even potential problems or illegalities associated with the funds be disclosed to avoid possible forfeiture, seizure, judgment lien, loan breach or default.

b.     Rhame knew that Gee trusted and reasonably relied upon Rhame to make full disclosure of any illegalities associated with the invested funds that could potentially affect the ownership and plan to market and sell the DST interests based upon confidence and trust that had been established in this and prior development projects, as joint-venturers and co-members of several companies, including the Yards, Cascades at Rea, Sherrills Ford, Arrowood and the BB&T project entities.

c.     Rhame knew or should have known of the legal defects or potential problems posed by the activities of Sterling with the funds that he was investing in the BB&T Project as described in the Civil Forfeiture and Criminal Indictment, and he knew that Gee had no way to know of or ascertain any of such legal defects or problems posed by Rhame's activities and association with Sterling.

d.     Rhame knew that the Nataxis primary loan document and guaranty executed at the

23

closing of the BB&T Project on December 19, 2014, required disclosure of any potential or actual illegal activities, fraud or money laundering associated with the funds invested by Rhame and he knew that Gee was relying upon Rhame to honestly disclose any such activities in connection with executing the required loan closing documents.

e. Rhame's many representations regarding the stringent regulatory compliance requirements for Sterling and its exemplary performance, were intentionally made to induce Gee to enter into the BB&T Project with Rhame by creating a false impression that Sterling was in compliance with all laws and regulations, that required his disclosure of any potential illegal activities used by Sterling to generate business, including at least wire fraud, mail fraud and Ponzi schemes.

80. As a result of Rhame's breach of duty to disclose, Gee completed the BB&T Project Closing and undertook management of the property but was unable to market or sell the 1031 DST interests or obtain long term leases or lease renewals of the property because of the Federal Civil and Criminal actions resulting from Rhame's illegal activities and breaches of his duties of good faith and fair dealing as described above.

81. During the initial weeks following the BB&T Closing on December 19, 2014, the Plaintiffs transitioned into the management of the property while undertaking efforts to set up the sale of the DST interests, including preparation of sales and marketing materials.

82. The Civil Forfeiture, Criminal Indictment and *lis pendens* extinguished all interest in any sale of the DST interests because full disclosure of the federal litigation was required, eliminating any prospective purchase interests due to the legal proceedings and the potential for

loan default, foreclosure, and loss of preferential capital gains tax benefits. Upon information and belief, prospective buyers sought alternate §1031 investment property unencumbered by civil forfeiture proceedings or allegations of criminal conduct against the property owner.

83. Rhame intentionally withheld from Gee the true facts and circumstances concerning the source of the funds he sought to invest through Gee, including Sterling's role in disseminating false information to stimulate demand for Iraqi dinar, Sterling's layaway-Ponzi scheme and Rhame's efforts to illegally "launder" his Sterling funds. Moreover, upon information and belief, in order to obtain Gee's trust and confidence, Rhame falsely represented that Sterling had passed extraordinary financial and regulatory audits and compliance procedures, which Gee reasonably believed, causing Gee to complete the BB&T Project transaction and to sign the Side Letter, despite being under duress.

84. Gee would not have entered into the BB&T transaction nor signed the Side Letter had Rhame not made the misrepresentations described above or had Rhame not concealed information about the unlawful activities of Sterling or Rhame's efforts to launder the funds he obtained from Sterling. As a result, Gee has incurred no less than the following economic damages as a result of the fraudulent conduct and actions of the Defendant:

a. Attorneys' fees incurred in connection with the Civil Forfeiture in excess of $200,000, with such common law indemnity and subrogation to 200 West Land for its payment of the sum of $186,953.57 to Gvest as the court finds fair and reasonable.

b. Damages associated with the inability to sell and market the DST interests in excess of $75,000.

25

## SECOND CLAIM: Declaratory Judgment

Plaintiffs are entitled to Declaratory Judgment setting aside the Side Letter as void, invalid and unenforceable on the grounds set forth below.

85.  Plaintiffs incorporate all preceding paragraphs and allegations as if fully set forth.

### A.      Lack of Consideration

86.      All of the material terms between Rhame and Gee for the purchase, financing and closing of the BB&T Project, including its management and the marketing and sale of the Section 1031 DST interests had been agreed upon prior to Rhame's demand that Gee sign the Side Letter on December 18, 2014.

87.      In reliance upon the agreement with Rhame, Gee had incurred significant due diligence expenses and obligations by December 18, 2014 in preparing for the December 19, 2014 closing.

88.      No additional consideration was provided by Rhame in exchange for the Side Letter other than what he had already agreed to provide in connection with his then existing agreement with Gee for the purchase, financing and closing of the BB&T Project, including its management and the marketing and sale of the Section 1031 DST interests. The Side Letter should be set aside in its entirety for lack of consideration.

### B.      Duress

89.      Rhame obtained Gee's signature to the Side Letter by wrongful act, specifically coercion centered upon Rhame's last minute threat to not go through with the transaction unless

26

Gee agreed to the additional terms set forth in the Side Letter for which there was no consideration. Rhame knew that Gee had incurred significant expenses and financial obligations that could not be avoided when he had Shumate demand the additional terms set out in the Side Letter the day prior to closing. Rhame also knew that Gee would be unable to find a substitute investor or capital within a day of closing and that failure to close would severely harm Gee's reputation in the structured real estate finance field and would cause irreparable financial and reputational damage to Gee in his business. Rhame utilized this knowledge along with his economic advantage to force Gee to sign the Side Letter against his will, not only to obtain the new, un-bargained for terms, but also in an effort to acquire Gee's 25% interest in Yards, which was completely unrelated to the BB&T transaction. The Side Letter is invalid and should be set aside due to execution procured under duress.

### C.     Mistake

90.     Gee entered into the BB&T Project transaction with Rhame, including the Side Letter, under the mistaken, but reasonable belief that the funds invested by Rhame in the project would not subject the property the civil and criminal forfeiture proceedings and *lis pendens* cloud on title. But for this mistaken belief, Gee would not have entered into the transaction, including the Side Letter.

91.     Rhame either: (a) knew or had reason to know of Gee's mistaken belief and failed to make full disclosure, or (b) caused Gee's mistaken belief by failing to disclose the illegal activities or illegal source of the funds, or (c) was also under the mistaken belief that the funds he invested in the BB&T Project were not subject to the civil or criminal forfeiture proceedings, in which case the mistake was mutual.

27

92.     As a result, Gee entered into the BB&T transaction, including the Side Letter, under a mistake or mutual mistake of material fact and the Side Letter should therefore be set aside in its entirety with reformation of the BB&T Project transaction as required by law and equity.

**D.     Supervening Frustration and Impracticality**

93.     Rhame's assertion of any claim based upon the Side Letter is barred by Supervening Frustration and Impracticality resulting from the Civil and Criminal Forfeiture Proceedings and cloud on title of the BB&T Financial Center caused by Rhame's criminal and wrongful activities which were unknown to the Plaintiffs. The negative publicity associated with the civil forfeiture, followed by the *lis pendens*, Rhame's criminal indictment and convictions, and resulting cloud on title, made it impossible to sell the section 1031 DST interests that had been fundamental to the BB&T Project and upon information and belief, resulted in failure of BB&T to renew its lease which expired on March 31, 2023.

94.      It was critically important to Gee and Rhame that the unfettered sale of the DST interests occur in order to return the initial capital investment in the BB&T Project. Gee would not have purchased the BB&T Project with Rhame and would not have executed the Side Letter had he known that Rhame was engaged in illegal activities or investing illegally tainted funds which could subject the property to forfeiture, seizure, judgment lien or default. Any attempt by Rhame to enforce the Side Letter should be denied due to Rhame's own nefarious actions that prevented Gee from executing the mutually agreed plan to generate return of the capital investment.

**E.     Unclean Hands**

95.     Any attempt by Rhame to enforce the Side Letter is barred by Rhame's unclean

28

hands in that all claims, damages, and relief which Rhame may seek from the Side Letter resulted from the criminal and/or wrongful actions of Rhame described in the above paragraphs.

96.     Had Rhame not engaged in the illegal activities described in the Civil Forfeiture Action and Criminal Indictment, the unfettered sale of the DST interests would have been accomplished with the commensurate return on capital and avoidance of any claim under the Side Letter.

**F.     Estoppel**

97.     It was critically important to both parties that the planned sale of the DST interests occur in order to repay the initial capital investment supplied by Rhame.

98.     Upon information and belief, Rhame's knowledge of the potential illegalities associated with his funds motivated his demand for the Side Letter shortly before closing in order to obtain additional protection against any negative effect the tainted funds might have on the DST sales.

99.     Rhame demanded the Side Letter for the primary purpose of protecting himself in case the illegalities associated with his invested funds negatively impacted sales of the DST interests by his last-minute requirement that Gee provide additional security from unrelated property consisting of Gee's Yards interest.

100.    Gee reasonably relied upon Rhame's representations regarding the legality of the invested funds and Rhame's business activities with Sterling, along with Rhame's concealment of the illegalities and defects which tainted the funds in agreeing to the BB&T transaction and the Side Letter.

29

101.    Rhame's effort to enforce the Side Letter results from and is motivated by his own fraudulent, deceptive, and inequitable conduct as set forth herein.

102.     In signing the Side Letter and closing on BB&T, Gee detrimentally relied upon Rhame's intentional misrepresentations, concealment, and deceit, designed in part by Rhame to obtain unrelated property and assets from Gee. Consequently, this court should set aside the Side Letter as unenforceable based upon principles of equity and estoppel.

**G.    Fraud**

103.    As described above,  Rhame fraudulently and intentionally concealed the legal defects and illegalities in the funds that he was investing in the BB&T Project with knowledge that Gee had no way to know of such legal defects, and with the intent that Gee would rely on such concealment in signing the Side Letter with the potential for Rhame to acquire Gee's 25%  interest in Yards, which was completely unrelated to the BB&T Project.

104.    The signing of the Side Letter by Gee was procured by Rhame's fraudulent concealment and misrepresentations and should be excised and set aside.

**H.    Breach of Contract**

105.    It was fundamental to the Parties' agreement with respect to the BB&T Project and part of the underlying covenant of good faith and fair dealing that neither party engage in illegal or illicit activities that would prevent or make it extremely difficult for the planned sale of the 1031 DST interests or that would negatively affect the ability to lease the property.

106.    Rhame's actions as described in the above Federal Actions, his misrepresentation and concealments all breached the covenant of good faith and fair dealing and damaged the

30

Plaintiffs and prevented the sale of beneficial DST 1031 interests and prevented Gee from complying with the Side Letter, should it be determined that the Side Letter was ever valid.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs pray the Court:

1. That Plaintiffs have and recover compensatory damages against the Defendant for his fraud upon the plaintiffs in excess of $75,000.

2. That the Side Letter be set aside and declared null and void and that the court enjoin the defendant from seeking to enforce the Side Letter.

3. That a jury hear the evidence and determine all issues of fact.

4. That Plaintiffs be awarded costs, and interest at the legal rate.

5. That Plaintiffs receive such other and further relief at law or in equity which the Court deems to be just and proper.

This _11_ day of September, 2024.

/s/Rex C. Morgan
REX C. MORGAN
Attorneys for Plaintiffs
N. C. Bar No. 9965
Baucom, Claytor, Benton, Morgan & Wood, P. A.
200 Providence Road, Suite 106
Charlotte, NC 28207
Phone: (704) 376-6527
Fax: (704) 376-6207
Email: rmorgan@baucomclaytor.com

31

/s/Jonathan Salmons
JONATHAN SALMONS
Attorneys for Plaintiffs
N. C. Bar No. 57201
Baucom, Claytor, Benton, Morgan & Wood, P. A.
200 Providence Road, Suite 106
Charlotte, NC 28207
Phone: (704) 376-6527
Fax: (704) 376-6207
Email: jsalmons@baucomclaytor.com